# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

ROBERT PERNELL MCCLOUD,

      Petitioner,

v.                                       Case No.  8:20-cv-408-CEH-JSS

SECRETARY, DEPARTMENT
OF CORRECTIONS,

      Respondent.

_____/

## ORDER

      Petitioner, a Florida prisoner, initiated this action by filing a petition for the writ of habeas corpus under 28 U.S.C. § 2254 (Doc. 1). Respondent filed a response opposing the petition (Doc. 8) to which Petitioner replied (Doc. 9). Upon consideration, the petition will be denied.

## I. BACKGROUND AND PROCEDURAL HISTORY

      Petitioner was convicted of two counts of first-degree murder (counts one and two), attempted first-degree murder (count three), conspiracy to commit burglary (count four), armed burglary of an occupied dwelling with an assault or battery (count five), and robbery with a firearm (count six) (Doc. 8-7, Ex. 20). He was sentenced to death on counts one and two, life in prison on counts three, five, and six, and five years in prison on count four (Doc. 8-8, Ex. 36). The Florida Supreme Court affirmed the convictions but reversed the death sentences and remanded for

resentencing to life in prison (Doc. 8-9, Ex. 43). *McCloud v. State*, 208 So. 3d 668 (Fla.

2016). The Florida Supreme Court set out the factual background of this case:

> Robert McCloud appeals his convictions and sentences for the first-degree murders of Dustin Freeman and Tamiqua Taylor. During the afternoon of October 3, 2009, McCloud and Andre Brown were driving around the Malibu neighborhood of Orlando, Florida, when they ran into Joshua Bryson. The three visited Major Griffin at his house, where a series of discussions about "hitting a lick" or robbing known drug dealer, Wilkins Merilan, began. Griffin and Bryson robbed Merilan on Father's Day of the same year and believed he held back large quantities of drugs and cash during that encounter. Jamal Brown (not related to Andre Brown) later joined the group, and the discussions culminated in a plot to burglarize Merilan's house in Poinciana, Florida, while Merilan was visiting Orlando.

> That evening, before leaving Orlando, the men equipped themselves with various firearms, including a .38 caliber revolver, a .40 or .45 caliber semiautomatic, and a 9 millimeter semiautomatic. They then traveled to Poinciana in two vehicles and, upon reaching Merilan's neighborhood between 10 and 11 p.m., drove down his cul-de-sac to surveil his house. The group then drove to the local Walmart and parked there to further discuss their plan. They may have made a second trip to Merilan's house and back to Walmart. After traveling back to the neighborhood just past midnight, Bryson positioned himself in his vehicle somewhere in close proximity to Merilan's street, while the others positioned themselves in Merilan's backyard. The group realized that Merilan in fact was home and also that a party was underway at an adjacent house. This caused them to pause and wait for about three hours while refining their plan.

> The group eventually decided to move forward with robbing Merilan. The physical evidence shows that the front door was kicked in and shots were simultaneously fired toward the master bedroom. Merilan was immediately subdued, bound by his wrists and ankles, and placed on the master bedroom floor. Taylor, Merilan's girlfriend who was living with him, was in the master bedroom. She was ordered to take Merilan's three-year-old daughter, who was spending the weekend with Merilan, and sit on the living room couch. Freeman, Merilan's friend who was visiting from Miami, was in the guest bedroom and was also bound and placed on the master bedroom floor.

The group ransacked the house, collecting about $4,000 to $5,000 in cash, $10,000 worth of marijuana, a .38 caliber revolver, and possibly a small quantity of cocaine. Believing more was in the house, they turned their attention to Merilan and began demanding the whereabouts of the rest of his drugs and cash. While still tied up and laying on the floor, Merilan was kicked and had a forty-pound dumbbell dropped on his head. His arms were sliced with a steak knife. Merilan also had boiling water laced with bleach poured on his back; the water seeped into the carpet and scalded his thighs, stomach, and groin area. He indicated that the drugs and money were in the tires of his Hummer vehicle in hopes that a pedestrian would see the cohorts or that the vehicle's alarm would activate. It was about that time that Bryson was summoned to the house.

While somewhat conflicting, the evidence generally shows that Merilan was either placed in the master bedroom closet or broke his restrains and ran into it. A series of loud and soft sounding gunshots subsequently rang out with multiple shots being fired at the closet, where Merilan was sitting with his back against the door. The shootings resulted in Merilan being shot several times, including in the stomach, testicle, and thigh. Freeman and Taylor were shot in the back of the head at close range while on the master bedroom floor and living room couch, respectively. The group subsequently fled the Poinciana area in their vehicles and rendezvoused back in Orlando, where they divided up the drugs and cash. McCloud took the stolen firearm.

In investigating the crimes, the Polk County Sheriff's Office (PCSO) focused on Bryson as a suspect after detecting his fingerprint in the back compartment of Merilan's vehicle. Bryson was arrested in Orlando on October 20, 2009. He initially denied his involvement, but after being confronted with the fingerprint evidence, he provided deputies with a statement implicating McCloud, Griffin, Andre, and Jamal as participants in the crimes. Griffin was arrested the following day but did not provide a statement to law enforcement officers. Andre was arrested one week later and Jamal months thereafter; both provided statements concerning the crimes.

McCloud was arrested on October 21, 2009. Orange County Sheriff's Office (OCSO) deputies apprehended McCloud in connection with an outstanding arrest warrant for an unrelated offense and notified Polk County authorities. That evening, PCSO Detective Troy Lung met them in a church parking lot and provided McCloud with his *Miranda* warnings, after which he agreed to speak with detectives. McCloud was

then transported to OCSO facilities, where he was questioned for the next several hours. During the interrogation, McCloud made several admissions to PCSO Detectives James Evans and Consuelo Gallegos–Bias in which he implicated himself in the burglary and robbery but denied harming Merilan, Taylor, and Freeman. Unbeknownst to McCloud, fifty-five minutes of his interview with Gallegos–Bias was video recorded.

McCloud and the other four men were charged by separate indictments, each alleging two counts of first-degree murder, and one count each of attempted first-degree murder, conspiracy to commit burglary, armed robbery, and armed burglary of an occupied dwelling with an assault or battery. Griffin was deemed legally incompetent to stand trial and diagnosed as intellectually disabled; thus, he was statutorily ineligible for the death penalty. Bryson, Andre, and Jamal entered into negotiations with the State and, among other terms, agreed to plead "no contest" to two counts of second-degree murder and testify truthfully in all proceedings concerning each codefendant. Bryson's agreement also included an imprisonment term of ten years, and Andre's and Jamal's agreements each included fifteen years. Bryson, Andre, and Jamal testified at McCloud's trial, but Jamal insisted on cross-examination that his testimony was false.

McCloud argued throughout the trial proceedings that his video-recorded statement with Detective Gallegos–Bias was involuntary and thus inadmissible because it was elicited through excessively coercive tactics by law enforcement officers. He further denied having any participation in the various crimes and admitted that he only engaged in the earlier stages of the discussions that occurred in Orlando on the afternoon of October 3, 2009. Also, McCloud insisted that at the times of the actual robbery, burglary, murders, and attempted murder, he was babysitting a child or children in the Apopka/Maitland area while his wife was in the hospital. He testified and called other witnesses in support of this alibi.

*McCloud*, 208 So. 3d at 672–75 (footnote omitted).  Petitioner was re-sentenced to life in prison on the two murder convictions (*Id.*, Ex. 48).

Petitioner filed a motion for postconviction relief under Florida Rule of Criminal Procedure 3.850 (*Id.*, Ex. 50). The motion was stricken (*Id.*, Ex. 51).

4

Petitioner filed another Rule 3.850 motion (*id.*, Ex. 52) which was denied (*Id.*, Ex. 53). The denial was affirmed on appeal (*Id.*, Ex. 57). *McCloud v. State*, 286 So. 3d 759 (Fla. 2d DCA 2019).

Petitioner filed his federal petition in this Court (Doc. 1) in which he alleges five grounds for relief.

## II. GOVERNING LEGAL PRINCIPLES

Because Petitioner filed his petition after April 24, 1996, this case is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Penry v. Johnson*, 532 U.S. 782, 792 (2001); *Henderson v. Campbell*, 353 F.3d 880, 889-90 (11th Cir. 2003). The AEDPA "establishes a more deferential standard of review of state habeas judgments," *Fugate v. Head*, 261 F.3d 1206, 1215 (11th Cir. 2001), in order to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002); *see also Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (recognizing that the federal habeas court's evaluation of state-court rulings is highly deferential and that state-court decisions must be given the benefit of the doubt).

A. Standard of Review Under the AEDPA

Under the AEDPA, habeas relief may not be granted regarding a claim adjudicated on the merits in state court unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The phrase "clearly established Federal law," encompasses only the holdings of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

"[S]ection 2254(d)(1) provides two separate bases for reviewing state court decisions; the 'contrary to' and 'unreasonable application' clauses articulate independent considerations a federal court must consider." *Maharaj v. Secretary for Dep't. of Corr.*, 432 F.3d 1292, 1308 (11th Cir. 2005). The meaning of the clauses was discussed by the Eleventh Circuit Court of Appeals in *Parker v. Head*, 244 F.3d 831, 835 (11th Cir. 2001):

> Under the "contrary to" clause, a federal court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the United States Supreme Court] on a question of law or if the state court decides a case differently than [the United States Supreme Court] has on a set of materially indistinguishable facts. Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the United States Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.

If the federal court concludes that the state court applied federal law incorrectly, habeas relief is appropriate only if that application was "objectively unreasonable." *Id.*

Finally, under § 2254(d)(2), a federal court may grant a writ of habeas corpus if the state court's decision "was based on an unreasonable determination of the facts

in light of the evidence presented in the State court proceeding." A determination of a factual issue made by a state court, however, shall be presumed correct, and the habeas petitioner shall have the burden of rebutting the presumption of correctness by clear and convincing evidence. *See Parker*, 244 F.3d at 835-36; 28 U.S.C. § 2254(e)(1).

B. Standard for Ineffective Assistance of Counsel

The United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), established a two-part test for determining whether a convicted person is entitled to relief on the ground that his counsel rendered ineffective assistance: (1) whether counsel's performance was deficient and "fell below an objective standard of reasonableness"; and (2) whether the deficient performance prejudiced the defense. *Id*. at 687-88. A court must adhere to a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id*. at 689-90. "Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id*. at 690; *Gates v. Zant*, 863 F.2d 1492, 1497 (11th Cir. 1989).

As observed by the Eleventh Circuit Court of Appeals, the test for ineffective assistance of counsel:

> has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial. Courts also should at

the start presume effectiveness and should always avoid second guessing with the benefit of hindsight. *Strickland* encourages reviewing courts to allow lawyers broad discretion to represent their clients by pursuing their own strategy. We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

*White v. Singletary*, 972 F.2d 1218, 1220-21 (11th Cir. 1992) (citation omitted). Under those rules and presumptions, "the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994).

C. Exhaustion and Procedural Default

The writ of habeas corpus cannot be granted unless the petitioner has exhausted all available state court remedies. *Coleman v. Thompson*, 501 U.S. 722, 731 (1991); *Lucas v. Sec'y, Fla. Dep't of Corr.*, 682 F.3d 1342, 1351 (11th Cir. 2012) (citing 28 U.S.C. § 2254(b), (c)). Exhausting state remedies requires a petitioner to "fairly present" his claims in each appropriate state court "thereby alerting that court to the federal nature of the claim." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citing *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999) and *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (per curiam)).

## III. ANALYSIS

GROUND ONE: THE TRIAL COURT ERRED WHEN IT EXCLUDED DR. KREMPER FROM TESTIFYING THAT MCCLOUDS'S STATEMENTS TO LAW ENFORCEMENT WERE COERCED IN VIOLATION OF THE 6TH AND 14TH AMENDMENTS TO THE U.S. CONSTITUTION'S RIGHT TO PRESENT A DEFENSE

Petitioner contends his right to present witnesses to establish a defense was violated when the trial court refused to allow Dr. Kremper to testify as an expert witness regarding psychological factors, environmental factors, and police tactics that rendered his statement to law enforcement involuntary. Petitioner alleges Dr. Kremper would have testified Petitioner was susceptible to suggestion and psychological coercion because of his "verbal and memory difficulties." He argues "[t]he expert testimony was critical to [his] defense and was his sole defense." He also argues the Florida Supreme Court's denial of his claim "was an unreasonable application of *Crane v. Kentucky*, 486 U.S. 683 (1991)."

A. Procedural Default

Respondent argues this claim is procedurally defaulted because it was not fairly presented to the state trial court as a federal claim (Doc. 8 at 4-7). The Court disagrees. Before proffering Dr. Kremper's testimony, defense counsel argued excluding the expert testimony violated Petitioner's federal right to present a complete defense under *Crane* (Doc. 8-7, Ex. 11, Part 5 at docket pp. 19-21). The same argument was raised on appeal (Doc. 8-8, Ex. 39 at docket pp. 412-19). Accordingly, the Court finds Ground One is not procedurally defaulted because it was fairly presented in each appropriate state court.

B. Merits

Although properly exhausted in state court, Ground One warrants no relief. Initially, the Florida Supreme Court's opinion does not address the federal claim made by Petitioner (Doc. 8-9, Ex. 43 at docket pp. 50-53). Rather, the opinion addressed and rejected Petitioner's state law claim, finding that although it was error under Florida law to exclude Dr. Kremper's testimony, the error was harmless (*Id.*). The crux of Petitioner's federal claim is that his federal constitutional rights to due process and a fair trial and to present witnesses in his favor were violated when the trial court excluded Dr. Kremper from testifying. Accordingly, the Court will review Petitioner's federal claim as argued in his petition *de novo*. *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010) (courts can deny habeas relief under § 2254 by engaging in *de novo* review when it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his claim is rejected on *de novo* review).

"[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane*, 476 U.S. at 690-91 (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). The right to present witnesses in one's own defense in a criminal trial lies at the core of the Fifth and Fourteenth Amendments' guarantee of due process of law. *Washington v. Texas*, 388 U.S. 14, 19 (1967). But in reviewing the evidentiary determination of a state trial judge, the federal court does not sit as a "'super' state Supreme Court." *Shaw v. Boney*, 695 F.2d 528, 530 (11th Cir. 1983). Generally a federal court will not review a trial court's actions regarding

10

the admission of evidence. *Id.*; *Nettles v. Wainwright*, 677 F.2d 404, 414 (5th Cir.

1982) (citing *Lisenba v. California*, 314 U.S. 219, 228 (1941)); *see also Nevada v. Jackson*,

596 U.S. 505, 509 (2013) ("rarely [has the Supreme Court] held that the right to

present a complete defense was violated by the exclusion of defense evidence under a

state rule of evidence."). Before habeas relief may be granted because of a state

court's erroneous evidentiary ruling, the violation must rise to the level of a denial of

"fundamental fairness." *Nettles*, 611 F.2d at 414. Fundamental fairness is violated

when the evidence excluded is material in the sense of a crucial, critical, highly

significant factor. *Boykins v. Wainwright*, 737 F.2d 1539, 1544 (11th Cir. 1984).

 Petitioner fails to show that excluding Dr. Kremper's testimony deprived him

of a fundamentally fair trial.[1] Petitioner was able to present defense theories to insert

reasonable doubt of his guilt: at the time of the crimes, he was home watching his

wife's child or children while she was at the hospital (alibi defense supported by

multiple witnesses – Doc. 8-6, Ex. 11, Part 4 at docket pp. 495-598); and his

statements to law enforcement were coerced (*Id.* at docket pp. 716-37).

 To this Court's knowledge, neither the Supreme Court nor the Eleventh

Circuit Court of Appeals has ever squarely addressed whether a state trial court's

exercise of its discretion to exclude expert testimony on false confessions violated a

criminal defendant's constitutional right to present relevant evidence. Moreover, a

---

[1] Dr. Kremper essentially would have testified to general factors that lead to false confessions and how diagnostic evaluations of Petitioner revealed he was susceptible to being induced to falsely confess (Doc. 8-7, Ex. 11, Part 5 at docket pp. 23-63).

number of federal courts have excluded expert testimony about false or coerced confessions, especially where the defendant can support his position he falsely confessed through other means. *See, e.g., Loza v. Mitchell*, 705 F.Supp.2d 773, 787–91 (S.D.Ohio 2010) (exclusion of expert's testimony regarding the credibility and reliability of defendant's confession did not violate petitioner's Fifth, Sixth, Eighth, or Fourteenth Amendment rights, where the jury had the opportunity to view a videorecording of the entire interview); *United States v. Sammons*, 535 F. Supp. 3d 697, 709 (S.D. Ohio 2021) (despite exclusion of expert's testimony that defendant gave false confession, defendant's right to present a full defense was unimpeded where defendant could "explain to the jury his position that he falsely confessed. . .through means such as voir dire, opening argument, physical evidence, lay witness testimony, cross-examination, jury instructions, and closing argument."); *Boes v. Warren*, 2013 WL 5499918, at *9 (E.D. Mich. Oct. 3, 2013) (despite denial of expert witness testimony on false confessions, petitioner presented her defense to the jury that her confession was unreliable considering "the jurors were able to watch the videotaped interrogations in their entirety and petitioner's counsel was able to cross-examine the detectives who conducted the interrogations"). *But see, e.g., United States v. Shay*, 57 F.3d 126 (1st Cir. 1995) (finding district court committed reversible error in excluding expert testimony on the impact of the defendant's "mental disorder" on the likelihood he gave a false confession).

Petitioner has shown no constitutional error in the exclusion of Dr. Kremper's proffered testimony. And even assuming that he had made such a showing,

Petitioner fails to demonstrate entitlement to relief. Any constitutional error by the trial court in excluding this evidence is subject to the harmless-error test set out in *Brecht v. Abrahamson*, 507 U.S. 619 (1993):

> In § 2254 proceedings, federal courts must evaluate constitutional errors under the harmless-error standard articulated in *Brecht v. Abrahamson*, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). As *Brecht* explained, "[federal] habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Id.* at 637, 113 S.Ct. at 1722. To find "actual prejudice," a federal habeas court must conclude that the error "had substantial and injurious effect or influence in determining the jury's verdict." *Id.* (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)).

*Hittson v. GDCP Warden*, 759 F.3d 1210, 1233–34 (11th Cir. 2014) (footnote omitted).

Petitioner has not established that omitting Dr. Kremper's proposed testimony had a substantial and injurious effect or influence on the verdict. The jury was aware of Petitioner's position that his statements were coerced and false through his own testimony and cross-examination of the officers. Moreover, the State presented significant evidence of his guilt besides his confession, including video surveillance placing Petitioner near, and direct testimony from co-defendants placing Petitioner at, the scene of the offenses, and Petitioner's own testimony he conspired with his co-defendants regarding the burglary.[2]

Considering the trial as a whole, Petitioner fails to show that excluding Dr. Kremper's testimony had a substantial and injurious effect or influence on the verdict

---

[2] Petitioner concedes "the snap shots, video, and testimony were highly damaging in conjunction with [his] coerced confession." (Doc. 1 at 16).

so as to result in actual prejudice. Accordingly, he does not demonstrate entitlement to habeas relief under Ground One.

GROUND TWO: THE TRIAL COURT ERRED IN DENYING MCCLOUD'S MOTION TO SUPPRESS HIS CONFESSION IN VIOLATION OF THE 5TH AND 14TH AMENDMENTS TO THE U.S. CONSTITUTION

Petitioner asserts the trial court violated his right against self-incrimination by denying his motion to suppress statements he made to police (Doc. 1 at 8). He contends the officers failed to stop questioning him after he invoked his right to end questioning and coerced his statements by: 1) threatening him with the death penalty; 2) threatening to take his children from him; 3) placing him in a room near his wife where he could hear her crying while officers yelled at her; 4) telling him if he told the truth "everything would be okay;" and 5) interrogating him for a long time. He also claims that at the time of the interrogation he had not slept for a long time due to drug use (Doc. 1 at 8-13).

A. Failure to honor Petitioner's right to end questioning

In his motion to suppress, Petitioner alleged that after *Miranda* rights were read to him, he denied involvement in the crimes, "clearly indicated he no longer wished to speak to detectives[,]" and "refused a formal interview of any kind with Detective Lung or his supervisor, Sergeant Giampavolo." (Doc. 8-2, Ex. 3 at docket p. 30). Despite Petitioner's "prior refusal to be interviewed by Detective Lung[,]" later that night Detective Evans questioned Petitioner and confronted him with accusations by co-defendant Bryson, but Petitioner "again denied involvement[.]"

(*Id*.). After midnight, Detective Bias questioned Petitioner for at least one and a half hours into the early morning hours (*Id*.).

During the hearing, Petitioner testified he told Detective Lung, Detective Evans, and Sergeant Giampavolo, each on separate occasions, either that he did not want to talk to "him" anymore or did not want to talk anymore (Doc. 8-2, Ex. 5 at docket pp. 288, 293, 299). However, Detective Lung, Sergeant Giampavolo, and Detective Evans each testified Petitioner never said he did not want to talk anymore or that he wanted an attorney (*Id*., Ex. 4 at docket pp. 78, 98, 134, 167-68). Although Detective Evans testified Petitioner "made it clear he was not going to answer questions" (*id*., Ex. 4 at docket p. 186), he explained his testimony meant Petitioner would not answer questions regarding his part in the robbery, not that Petitioner was refusing to answer more questions (*Id*., Ex. 4 at docket pp. 201-02, 204-05). And Detective Bias, the final officer to whom Petitioner spoke and gave details about the offenses, testified Petitioner told her he did not want to talk to the other detectives but would talk to her (*Id*., Ex. 5 at docket pp. 241-42).

B. Coercive tactics

 Petitioner alleged in his motion to suppress he was subjected to "hunger, thirst, sleep-deprivation, threats and intimidation" during the interrogation (Doc. 8-2, Ex. 3 at docket p. 31). At the hearing he testified his confession was coerced because: 1) officers threatened him that if he did not "admit to some type of involvement [in the crimes], he would be subject to the death penalty. . . ."; 2) he could hear officers yelling at his wife in another room and her crying; and 3)

15

Detective Bias "assured [him] that they were going to help [him] out." (Doc. 8-2, Ex. 5 at docket pp. 277-81, 291, 303). He also testified his confession was not reliable because at the time of the interrogation, he had not slept "for three days" because he "was on drugs, taking Ecstasy." (*Id.*, Ex. 5 at docket pp. 296-97).

The officers testified they made no threats or promises to Petitioner and denied yelling at his wife (Doc. 8-2, Ex. 4 at docket pp. 65, 93, 144-45, 154-55, 172-73, 193-94; Ex. 5 at docket pp. 226, 265). They also testified that during the interrogation Petitioner was "very coherent," understood and could answer the questions, and they had no "problem at all communicating with him that night." (*Id.*, Ex. 4 at docket pp. 79, 162; Ex. 5 at docket p. 264). Finally, they testified Petitioner was provided food, drinks, and bathroom breaks (*Id.*, Ex. 4 at docket pp. 154, 156-57, 165-66,183-84; Ex. 5 at docket pp. 231, 239).

After the hearing, the trial court denied the motion as follows (Doc. 8-2, Ex. 6 at docket pp. 330-31):

<u>FACTS</u>

On October 4, 2009, a home invasion robbery and double homicide occurred in the Poinciana area of Polk County, Florida. Thereafter, the Polk County Sheriff's Office began their investigation and developed several suspects, among them being the Defendant, Robert McCloud.

Detective Troy Lung was the lead investigator for the Polk County Sheriff's Office and, on October 21, 2009, was informed that Robert McCloud had been arrested in Orange County, Florida on an outstanding Warrant concerning other charges.

Detective Lung travelled to Orange County and initially met Mr. McCloud at the location where he had been arrested. At that time,

Detective Lung read Mr. McCloud his Miranda Warnings. Mr. McCloud acknowledges that his Miranda Warnings were read to him by Detective Lung.

The Defendant, Robert McCloud, was eventually transported to the Orange County Sheriff's Office Substation and placed in an interview room. He was placed in the interview room sometime between 5:30 and 6:30 p.m.

Over the next several hours, various Detectives from the Polk County Sheriff's Office interviewed the Defendant, Robert McCloud, and sometime between approximately 2:15 - 2:30 a.m. on October 22, 2009, Detective Bias's interview with Mr. McCloud began to be video recorded. The video recording has been marked as State's Exhibit 1 for the purposes of this suppression hearing.

The Defendant contends that prior to the video recording he was repeatedly threatened with the Death Penalty and/or promised some sort of leniency if he gave a statement implicating himself in the robbery/homicides. The Defendant also contends that he sought to terminate the interviews and questioning on numerous occasions, but that the Detectives ignored his requests and continued with their questioning.

All of the Detectives involved categorically state that no threats were made to the Defendant nor were any promises made to him.

The Detectives also each testified that, at no point, did the Defendant request that the interview be terminated or that he was refusing to answer any further questions the Detectives might have for him.

## ANALYSIS

The issue before the Court pits the credibility of the Defendant against the credibility of the various Detectives involved in the interrogation of the Defendant.

Based on a review of the totality of the circumstances (including the testimony provided by all of the witnesses and a repeated review of the video recording), the Court finds that the Defendant never unequivocally and/or unambiguously requested a termination of his interrogation. See, *State v. Owen*, 696 So2d 715 (Fla. 1997).

The Court also concludes that the Defendant was never threatened or promised anything and that his statements made during the video recording were voluntary.

On appeal, Petitioner argued it was error to deny the motion to suppress (Doc. 8-8, Ex. 39 at docket pp. 425-29). In affirming the denial, the Florida Supreme Court stated:

Motion to Suppress

McCloud contends that the trial court erred by denying his motion to suppress his confession and the corresponding video recording of it. In *Jackson v. State*, 18 So.3d 1016 (Fla.2009), we explained the standard for reviewing rulings on motions to suppress:

"A trial court's ruling on a motion to suppress comes to the appellate court clothed with a presumption of correctness and the court must interpret the evidence and reasonable inferences and deductions derived therefrom in a manner most favorable to sustaining the trial court's ruling." *Rolling v. State*, 695 So.2d 278, 291 (Fla.1997) (citing *McNamara v. State*, 357 So.2d 410, 412 (Fla.1978)). In reviewing a trial court's ruling on a suppression motion, this Court conducts a two-step analysis in which we determine whether (1) competent, substantial evidence supports the trial court's findings of historical fact; and (2) the trial court reached the correct legal conclusion. *See Thomas v. State*, 894 So.2d 126, 136 (Fla.2004) (citing *Connor v. State*, 803 So.2d 598, 608 (Fla.2001)).

*Id.* at 1027–28. Further, "[a]s long as the trial court's findings are supported by competent substantial evidence, 'this Court will not substitute its judgment for that of the trial court on questions of fact, likewise of the credibility of the witnesses as well as the weight to be given to the evidence by the trial court.'" *Blanco v. State*, 702 So.2d 1250, 1252 (Fla.1997) (quoting *Demps v. State*, 462 So.2d 1074, 1075 (Fla.1984)); *accord Cox v. State*, 966 So.2d 337, 357–58 (Fla.2007); *Parlee v. State*, 899 So.2d 458, 460 (Fla. 5th DCA 2005). Inasmuch as "a ruling is based on an audio recording [or videotape], the trial court is in no

18

better position to evaluate such evidence than the appellate court, which may review the tape for facts legally sufficient to support the trial court's ruling." *Bailey v. State*, 31 So.3d 809, 812 (Fla. 1st DCA 2009) (quoting *Dooley v. State*, 743 So.2d 65, 68 (Fla. 4th DCA 1999)).

*Invocation of the Right to Remain Silent*

McCloud specifically challenges the admissibility of the statement he provided to PCSO detectives on the ground that he reasserted his *Miranda* right to remain silent before providing inculpatory information. The Fifth Amendment to the United States Constitution decrees that "no person shall be ... compelled in any criminal case to be a witness against oneself." Accord art. I, § 9, Fla. Const. Once "a suspect, in any manner, indicates that he or she does not wish to engage in an interrogation with law enforcement, an interrogation must not start, or if it has begun, must cease immediately." *Deviney v. State*, 112 So.3d 57, 74 (Fla.2013). However, we employ a different standard where a defendant has been instructed on but waives his or her *Miranda* rights.

> [W]here a defendant has received proper *Miranda* warnings and waived his *Miranda* rights, he must make an unequivocal or unambiguous request to terminate an interrogation in order to reassert those rights. *State v. Owen*, 696 So.2d 715, 719 (Fla.1997) (citing *Davis v. United States*, 512 U.S. 452, 461, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994)). If a defendant's attempt to revoke his waiver is ambiguous or equivocal, police are not required to either cease questioning or to clarify whether the defendant's statement was in fact a reassertion of his *Miranda* rights. *Id*. A revocation "is unambiguous if a reasonable police officer under the circumstances would understand that the suspect is invoking the right." *Womack v. State*, 42 So.3d 878, 883 (Fla. 4th DCA 2010). When determining whether a revocation is unambiguous, we consider "whether the response refers to specific questions about the crime or about the underlying right to cut off all questioning." *Id*. (citing *Cuervo v. State*, 967 So.2d 155, 163 (Fla.2007)).

*Braddy v. State*, 111 So.3d 810, 830 (Fla.2012). Still, "context is generally as important, if not more important, than the exact words a

suspect uses in a statement that is alleged to be an invocation of the right to remain silent." *Bailey*, 31 So.3d at 814–15.

Here, it is undisputed that after his arrest but before interrogation, McCloud was properly instructed of his *Miranda* rights but agreed to speak with PCSO detectives at the OCSO. We therefore conclude that McCloud initially waived his right to remain silent. Hence, the only relevant inquiry is whether he unambiguously revoked that waiver. McCloud chiefly highlights his interview with PCSO Detective James Evans for support that "he unequivocally invoked his right to remain silent and law enforcement did not scrupulously honor his request." We disagree.

In reviewing Evans' testimony in its entirety, it appears that any indication that McCloud no longer wished to speak or refused to divulge further information was in direct response to questions about the extent of his role in the robbery aspect of the crimes. In fact, immediately before these questions were asked, McCloud had already disclosed the shooter's identity (Griffin, according to McCloud) and requested that Evans inform Andre that he did not implicate the others as the shooter. As such, we are not convinced that McCloud's statements to Evans show anything more than a declination to answer questions about a specific aspect of all of the crimes that transpired on the night in question.

This observation is bolstered by McCloud's subsequent interactions with Consuelo Gallegos–Bias, the third and final detective to interview McCloud. Gallegos–Bias testified that McCloud initiated the interview with her by asking if she had any questions. She also testified that McCloud admitted that he lied to the first two interrogating detectives, but assured her that he would tell the truth and that she could relay the information to the others. The video recording of McCloud's confession depicts this precise agreement between the two. And, Lieutenant Louis Giampavolo testified at trial that it is not atypical for a suspect to talk to one detective but not want to speak with another. McCloud's apparent willingness to continue speaking with a particular detective negates any argument that he unambiguously indicated to law enforcement that he wished to terminate all questioning that evening. *See Braddy*, 111 So.3d at 831 ("Braddy's multiple requests to speak to one detective but not the other belie his claim that he did not wish to speak to detectives at all.").

For these reasons, McCloud has failed to demonstrate that he unambiguously reasserted his *Miranda* right to remain silent before

providing the statement at issue. Accordingly, we deny relief as to this claim.

*Voluntariness of Confession*

McCloud argues that his confession is nevertheless unreliable because it resulted from coercive police tactics, including repeated threats to seek first-degree murder charges and the death penalty and promises not to do so if he cooperated. In evaluating the admissibility of a confession to be used against a defendant at trial, we have instructed that "[t]he test is ... one of voluntariness, or free will, which is to be determined by an examination of the totality of the circumstances surrounding the confession." *Baker v. State*, 71 So.3d 802, 814 (Fla.2011) (quoting *Owen v. State*, 862 So.2d 687, 695 (Fla.2003); *Traylor v. State*, 596 So.2d 957, 964 (Fla.1992)). "As this Court and the United States Supreme Court have made clear, 'the ultimate issue of voluntariness is a legal rather than factual question.'" *Ross v. State*, 45 So.3d 403, 418 (Fla.2010) (quoting *Ramirez v. State*, 739 So.2d 568, 575 (Fla.1999)). Specifically, "whether a confession is admissible depends on (1) whether the interrogating officers engaged in coercive activity, and (2) whether that activity was sufficient to overcome the free will of the defendant." *Baker*, 71 So.3d at 814; *see generally Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). When assessing the totality of the circumstances, courts have considered numerous factors, including but not limited to: (1) the location of the interrogation, *see Drake v. State*, 441 So.2d 1079, 1081 (Fla.1983); (2) whether the confession was elicited by a direct or implied promise of leniency, *see Bruno v. State*, 574 So.2d 76, 79–80 (Fla.1991); (3) "the defendant's prior experience with police ... as well as ... police brutality, and whether the defendant was deprived of food or water or sleep," *Green v. State*, 878 So.2d 382, 383 (Fla. 1st DCA 2003); and (4) whether the defendant initiated contact with law enforcement officials, *see Michigan v. Harvey*, 494 U.S. 344, 356, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990). The State bears the burden of demonstrating by a preponderance of evidence that a confession was freely and voluntarily given. *Cuervo*, 967 So.2d at 160 (citing *Davis v. State*, 859 So.2d 465, 482 (Fla.2003)).

In this case, the evidence presented by the State and defense at the suppression hearing is directly conflicting. McCloud's testimony was the only evidence adduced by the defense to prove that his interrogation was interlaced with improper threats and promises about

first-degree murder charges and the death penalty. McCloud testified that Giampavolo and Evans of the PCSO repeatedly exclaimed in a combative manner that he would get "the needle." McCloud also testified that Giampavolo insinuated that McCloud was guilty because a gun—which, at the time, was suspected of being the murder weapon—was found on him when he was arrested. Finally, McCloud testified that Gallegos–Bias assured him that he would not be charged with murder and subjected to the death penalty if he cooperated.

In stark contrast, Giampavolo, Evans, and Gallegos–Bias, as well as PCSO Detective Lung expressly testified that no threats or promises were made to McCloud during their respective interactions with him. Each officer also denied observing such activity by other law enforcement personnel. Based on our independent review of McCloud's video-recorded statement, we have detected no apparent signs in McCloud's demeanor or interaction with Gallegos–Bias indicating that he was threatened in any way. "We have, in the past, upheld the admission of confessions in situations where the defendant's testimony was inconsistent with the testimony of every other witness at the suppression hearing." *Johnson v. State*, 696 So.2d 326, 330 (Fla.1997) (citing *Maqueira v. State*, 588 So.2d 221, 223 (Fla.1991); *McDole v. State*, 283 So.2d 553, 554 (Fla.1973)); *see also Hall v. State*, 107 So.3d 262, 272 (Fla.2012) (holding that the State proved voluntariness of confession by a preponderance of evidence where defendant alleged he was beaten by correctional officers while being detained after victim's murder—all twelve State witnesses testified during suppression hearing that defendant was never threatened or physically abused during detainment; defendant was the sole witness presented by defense to contradict State's witnesses; he was arrested without incident; and video recording revealed no obvious signs of abuse or injury).

Moreover, the evidence supports the conclusion that McCloud's confession resulted from his own realization that the attendant circumstances were heavily stacked against him. Prior to McCloud's arrest, codefendant Bryson provided a statement to deputies in which he implicated himself, McCloud, and the other codefendants. As previously noted, the OCSO officers who arrested McCloud found a gun on him—which McCloud knew was stolen from Merilan's house on the night of the crimes—and believed it to be connected with the murders of Freeman and Taylor. The video recording of McCloud's statement depicts him uttering as an aside, "I done admitted to being in the house so that f* * *ed me up off rip. That's conspiracy." He later commented that he "just f* * *ed up," which, according to Gallegos–

Bias' testimony, meant McCloud realized he should not have made inculpatory admissions. Also, Evans testified that McCloud pleaded for him to inform codefendants Andre and Jamal that McCloud had confessed only to Griffin being the shooter, presumably to curry favor if they testified at trial. Finally, the record reflects that McCloud was a five-time convicted felon at the time of the interrogation in question, and thus likely understood that a first-degree murder conviction carried severe penalties, including potentially a death sentence.

Given this evidence, McCloud certainly would have known it was in his best interest to provide his version of the criminal events in order to minimize his culpability. Indeed, the record also reflects that Detectives Evans and Gallegos–Bias encouraged McCloud to do so during their respective interviews with him. Merely "[e]ncouraging or requesting a person to tell the truth does not result in an involuntary confession." *Reeves v. State*, 67 So.3d 380, 386 (Fla. 4th DCA 2011) (citation omitted).

McCloud maintains that detectives purposely did not record the interrogation segments during which the alleged misconduct occurred. The record is devoid of legally sufficient evidence supporting this accusation. First, OCSO Corporal Duana Pelton explained that when a guest agency requests to utilize the OCSO's interrogation facility, OCSO personnel would maintain control of the monitoring system's operations, including the recording function. Pelton further explained that the OCSO adopted an informal policy of recording all interrogations in their entirety to safeguard against potential accusations of witness and defendant abuse. Pelton testified that because she was not present at the OCSO during McCloud's interrogation, she was relying on her subordinate's report regarding the events surrounding the interrogation to aid her in her testimony. Pelton admitted that the report did not indicate to what extent, if any, McCloud's interrogation was recorded. And, her subordinate was unavailable to testify at the suppression hearing and trial.

Also, Giampavolo explained the circumstances surrounding his decision to instruct Gallegos–Bias to record McCloud's confession:

Q: In the Polk County Sheriff's Office homicide division in 2009, was it your practice if you were at your own facility to always record every minute of anytime a suspect's in a room?

A: No.

23

Q: You said that you recall instructing someone at some point to record Mr. McCloud. What types of things do you consider as a supervisor in telling someone to turn a recorder on?

A: It was brought to my attention that Mr. McCloud went through a statement with Detective Bias and she was gonna get a recorded statement on a digital recorder and Mr. McCloud did not want to give the statement on a digital recorder. So at that point when I was made aware of that, I instructed someone to turn the audio on and, you know, the video and record that interview.

Giampavolo added:

Q: Lieutenant Giampavolo, if as a supervisor you're aware that a suspect is denying his involvement in what you suspect him to be involved in and continues to deny it, do you typically record that?

A: No.

Q: If a suspect starts making inculpatory or incriminating statements saying that he was involved in a crime, do you typically direct that those statements be recorded?

A: Yes.

Q: Was it your understanding when you were told this about Detective Bias that Mr. McCloud had changed from denial to admission and that's why Detective Bias wanted to record his statement?

A: Yes, sir.

Q: And so you wanted to capture it?

A: Yes, sir.

Giampavolo further recalled handling other tasks while supervising the interviews associated with McCloud's investigation, including the interview of McCloud's wife. Consequently, Giampavolo was unaware that McCloud was providing incriminating information during Evans' interview. Accordingly, Giampavolo did not instruct anyone to record it and did not instruct Evans to walk McCloud through his admissions again for purposes of recording them. Finally,

Evans and Gallegos–Bias testified that they were unaware of the monitoring system's recording feature until after they had completed their interviews.

It is evident that the dominant purpose of the officers' decisions against recording McCloud's entire interrogation was not to conceal any improper conduct but instead to document only admissions pertinent to the investigation. Moreover, there is no indication in the record of collusion between the law enforcement agencies. In fact, the OCSO's foolproof recording policy was intended to prevent the very accusations that McCloud now asserts in this case. Therefore, any notion that the host agency, OCSO, would have exposed itself to said accusations by knowingly sanctioning the less-stringent recording policy that the visiting agency, PCSO, employed for McCloud's interrogation is dubious. The failure to record the interrogation in its entirety appears to have been attributable to the OCSO's negligence, rather than the misconduct McCloud has alleged against the PCSO.

On balance, we are not left with a definite and firm conviction that the trial court erred in finding that McCloud's confession was given voluntarily and free of threats or coercion. *See Smith v. State*, 59 So.3d 1107, 1121 (Fla.2011). Accordingly, relief is denied as to this claim.

*McCloud*, 203 So.3d at 675-80.

The Florida Supreme Court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

Petitioner first contends that after the interrogation started, he asserted his right to remain silent by telling the officers he did not want to talk anymore. "When a person undergoing a custodial interrogation states that he wishes to remain silent the questioning must end. . . ." *United States v. Acosta*, 363 F.3d 1141, 1151 (11th Cir. 2004) (citing *Miranda v. Arizona*, 384 U.S. 436 (1966)). However, a suspect's

25

invocation of his rights must be unequivocal. *United States v. Ochoa*, 941 F.3d 1074, 1098 (citing *Davis v. United States*, 512 U.S. 452, 461–62 (1994)).

The state courts found Petitioner never unambiguously and unequivocally asserted his right to remain silent and to terminate the interrogation. This finding is supported by the record. Each officer testified Petitioner never stated he wished to remain silent or to terminate the interrogation. Detective Evans testified, at most, that Petitioner said he would not answer questions regarding his role in the crimes. Petitioner's refusal to talk to Detective Evans about his actions during the offenses was not an unequivocal demand to end the interrogation. *See United States v. Mikell*, 102 F.3d 470, 477 (11th Cir. 1996) ("[W]e hold that a suspect's refusal to answer certain questions is not tantamount to the invocation, either equivocal or unequivocal, of the constitutional right to remain silent and that questioning may continue until the suspect articulates in some manner that he wishes the questioning to cease."); *Owen v. Fla. Dep't of Corr.*, 686 F.3d 1181, 1194 (11th Cir. 2012) ("Owen's two statements about not wanting to 'talk about it'—which were isolated statements, made nearly 30 minutes apart, in response to questions about very specific details, in the midst of a give-and-take discussion of the evidence against Owen—did not constitute an unequivocal invocation of Owen's right to remain silent."). Moreover, after Petitioner spoke to the other officers and allegedly stated he did not want to talk to them anymore, Detective Bias testified Petitioner told her "that he would tell me the truth and I could tell the other detectives" and "[h]e told me he wanted to talk to

me, but not to them." (Doc. 8-2, Ex. 5 at docket p. 242). This further supports the finding that Petitioner did not unequivocally request to terminate the interrogation.

To the extent that Petitioner and the officers provided inconsistent testimony about whether Petitioner stated he wanted to end the interrogation, the state trial court implicitly made a credibility determination when it found that, consistent with the officers' testimony, Petitioner never unambiguously "requested a termination of his interrogation." This credibility determination must be afforded deference. *See Baldwin v. Johnson*, 152 F.3d 1304, 1316 (11th Cir.1998) ("We must accept the state court's credibility determination and thus credit [the attorney's] testimony over" that of the petitioner.); *Devier v. Zant*, 3 F.3d 1445, 1456 (11th Cir.1993) ("Findings by the state court concerning historical facts and assessments of witness credibility are ... entitled to the same presumption accorded findings of fact under 28 U.S.C. § 2254(d)."); *Williams v. Johnson*, 845 F.2d 906, 909 (11th Cir. 1988) ("Implicit findings regarding the credibility of witnesses are included among the findings that this Court must credit."). Petitioner does not point to any evidence aside from his own testimony, which the state court did not credit, that the state court's conclusion was erroneous. Thus, this Court defers to the state court's credibility determination.

Petitioner also contends his statements were involuntary because they were coerced. "[A] defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession." *Jackson v. Denno*, 378 U.S. 368, 376 (1964). "The applicable standard for determining whether a confession is voluntary is whether, taking into consideration the totality of

the circumstances, the statement is the product of the accused's free and rational choice." *Leon v. Wainwright*, 734 F.2d 770, 772 (11th Cir. 1984) (internal quotation marks omitted). "This means that it 'must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence.'" *Id*. (quoting *Bram v. United States*, 168 U.S. 532, 542-43 (1897)). "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). A confession is involuntary if the suspect's "will was overborne in such a way to render his confession the product of coercion." *Arizona v. Fulminante*, 499 U.S. 279, 288 (1991).

The Court's independent review of the record leads to the conclusion that Petitioner's statements were voluntary under the totality of the circumstances. The record reflects that each officer denied making any threat or promise of any kind. And each officer denied yelling at Petitioner's wife in another room.[3] Moreover, both the state trial court and the Florida Supreme Court reviewed the videotaped portion

---

[3] In his petition, Petitioner alleges officers "threatened to take his children away." (Doc. 1 at 8). The record reveals Petitioner never testified the officers threatened to take his children from him if he refused to talk or admit involvement in the crimes. Rather, during the hearing on the motion to suppress, Petitioner testified that when Detective Evans threatened him with the death penalty, he also stated "do you want your kids to lose their father?" (Doc. 8-2, Ex. 5 at docket p. 291). And during trial, Petitioner again testified Detective Evans threatened him about the death penalty then said, "my kids would lose their father." (Doc. 8-6, Ex. 11, Part 4 at docket p. 731). Thus, the record is devoid of any evidence that the officers threatened to take Petitioner's children from him if he refused to talk.

of the interrogation, and the Florida Supreme Court specifically stated it "saw no apparent signs in McCloud's demeanor or interaction with Gallegos–Bias indicating that he was threatened in any way." Although Petitioner testified that he was threatened with the death penalty and promises were made, the state trial court implicitly found the officers' testimony more credible. The state court's credibility finding is a factual determination presumed correct unless Petitioner overcomes the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Rolling v. Crosby*, 438 F.3d 1296, 1301 (11th Cir. 2006). And deference to a credibility determination is heightened on federal habeas review. *See Kurtz v. Warden, Calhoun State Prison*, 541 Fed. App'x 927, 929 (11th Cir. 2013) ("'A certain amount of deference is always given to a trial court's credibility determinations,' and a credibility determination in a case on habeas review receives heightened deference." (quoting *Gore v. Sec'y, Dep't of Corr.,* 492 F. 3d 1273, 1300 (11th Cir. 2007))). Petitioner has not rebutted the presumption of correctness by clear and convincing evidence. *Id.*

　　Petitioner testified that after he was confronted with co-defendant Bryson's statement about Petitioner's involvement, and Detective Bias gave her theory of the events, he made false statements about his involvement because the officers gave him the impression that if he admitted to participating in the robbery, the officers would help him or go light on him, and he would not be the one to get the death penalty (Doc. 8-2, Ex. 5 at docket pp. 302-05). But this testimony was countered by the officers, each who testified no promises of any kind were made to Petitioner.

Moreover, Petitioner admitted involvement in the crimes only after he was shown or informed of Bryson's statement implicating him and the other co-defendants.[4] As the Florida Supreme Court stated, considering Bryson's statement and that Petitioner was arrested with a gun taken from the home in which the offenses occurred, Petitioner "certainly would have known it was in his best interest to provide his version of the criminal events in order to minimize his culpability."

Petitioner next contends he confessed because the interrogation was long and "[t]hey wore me down." (Doc. 8-2, Ex. 5 at docket p. 301). He was interrogated, "off and on," for approximately six hours (*Id.*, Ex. 4 at docket p. 51). But that alone fails to establish coercion. *See Berghuis*, 560 U.S. at 387 ("[T]here is no authority for the proposition that an interrogation of [three hours] is inherently coercive."); *see also United States v. Salman*, 286 F Supp. 3d 1325, 1351 (M.D. Fla. 2018) (finding no coercive conduct "notwithstanding the 5.5 hours of questioning."). *Cf. Ashcraft v. State of Tenn.*, 322 U.S. 143, 154 (1944) (concluding that questioning a suspect continuously for 36 hours, without rest or sleep, was "so inherently coercive that its very existence is irreconcilable with the possession of mental freedom by a lone suspect against whom its full coercive force is brought to bear."). Generally, "where

---

[4] There was nothing coercive about showing or informing Bryson's statement to Petitioner because it was a truthful assertion about the evidence against him. *See, e.g., U.S. v. Tutino*, 883 F.2d 1125, 1138 (2d Cir.1989) (once *Miranda* warnings are given, "agents [are] free to discuss with [suspects] the evidence against [them] and the reasons why [they] should cooperate"). *See also, United States v. Farley*, 607 F.3d 1294, 1328 (11th Cir. 2010) (even "[m]isleading a suspect about the existence or strength of evidence against him does not by itself make a statement involuntary.") (citations omitted).

interrogations of greater duration were held to be improper, they were accompanied.
. .by other facts indicating coercion, such as an incapacitated and sedated suspect,
sleep and food deprivation, and threats." *Berghuis*, 560 U.S. at 387 (citing *Connelly*,
479 U.S., at 163–164, n. 1). Here, any coercive effect from the length of the
interrogation was diminished by Petitioner being provided food, drinks, and multiple
breaks during the interrogation. *See Lumpkins v. Sec'y Dep't of Corr.*, 449 F. App'x 879,
885 (11th Cir. 2011) (finding 17-hour interrogation, which included a 5- or 6-hour
break while detectives interviewed alibi witnesses, "did not render Lumpkins's
confession involuntary.").

Petitioner also contends his statements were not voluntary because at the time
of the interrogation, he had not slept for approximately three days due to drug
(Ecstasy) use, and he was "high." But a suspect's intoxication does "not affect the
voluntariness of his confession unless it undermines his ability to comprehend in a
general way what he is doing and to communicate with coherence and context."
*Arvelo v. Sec'y, Fla. Dep't of Corr.*, 687 F. App'x 901, 906 (11th Cir. 2017) (citation
omitted). The officers testified Petitioner exhibited no signs of intoxication, appeared
to understand the questions, answered the questions, and was "very coherent." And
Petitioner alleges no specific facts indicating he was exhibiting any visible signs of
intoxication (slurred speech, confusion, etc.) or unable to comprehend and answer
the questions. Moreover, the state courts reviewed the videotaped portion of the
interrogation and therefore could observe Petitioner's demeanor and condition.

The totality of the circumstances under which Petitioner gave his statements reflects his statements were voluntary and not coerced. Therefore, Petitioner fails to show the state courts' rejection of this claim of trial court error in denying his motion to suppress was contrary to, or an unreasonable application of, clearly established federal law or was based on an unreasonable application of the facts.[5] Thus, Petitioner is not entitled to relief on Ground Two.

GROUND THREE: TRIAL COUNSEL FAILED TO OBJECT TO THE INTRODUCTION OF THE MURPHY'S OIL VIDEO SURVEILLANCE TAPE AND STILL SHOTS FROM SAME BASED ON RELEVANCE AND AUTHENTICATION IN VIOLATION OF THE 6TH AND 14TH AMENDMENTS TO THE U.S. CONSTITUTION

Petitioner contends counsel was ineffective in failing to object to the introduction of the surveillance videotape, and "still shots" from that videotape, from the Murphy's Oil gas station (located outside of a Walmart) based on authenticity and relevancy. He asserts both the video and still shots "were never shown to be 1.) relevant to the case; 2.) authentic; or 3.) have [sic] the proper foundation to be hold [sic] an indicia of reliability." He argues had counsel objected to the video and still

---

[5] In neither his petition nor his reply does Petitioner argue, in support of Ground Two, that the state court erred in denying his motion to suppress because the officers purposely failed to record the parts of the interrogation during which the alleged coercion occurred. Even if he had, the outcome, under the totality of the circumstances, is the same. The Florida Supreme Court's determination that "[t]he record is devoid of legally sufficient evidence supporting this accusation" is supported by the record evidence showing the officers from the Polk County Sheriff's Office (PCSO) interrogated Petitioner at the Osceola County Sheriff's Office (OCSO) facility, no OCSO employee activated the monitor's recorder, the PCSO had no policy at its facility to record all times in which a suspect is in an interrogation room, and Sergeant Giampavolo instructed someone to record the interrogation only after he was informed Petitioner was going to give a statement to Detective Bias but did not want her to record it with her "digital" recorder.

shots, the objection would have been sustained because there was no testimony or evidence establishing the location of the Murphy's Oil gas station. He further argues the video and still shots "were highly damaging" and had they been excluded, "there is a reasonable probability that the jury would have found [him] not guilty. . . ."

Petitioner admits he did not exhaust this claim of ineffective assistance of trial counsel in the state courts (Doc. 1 at 18). Respondent therefore argues Ground Three is procedurally barred from federal review (Doc. 8 at 17-20).

"If the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001). To establish cause for a procedural default, a petitioner "must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). To show prejudice, a petitioner must demonstrate not only that an error at the trial created the possibility of prejudice, but that the error worked to his actual and substantial disadvantage and infected the entire trial with "error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982). In other words, a petitioner must show at least a reasonable probability of a different outcome. *Henderson*, 353 F.3d at 892.

Absent a showing of cause and prejudice, a petitioner may obtain federal habeas review of a procedurally defaulted claim only if review is necessary to correct

a "fundamental miscarriage of justice." *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Murray v. Carrier*, 477 U.S. 478, 495–96 (1986). A fundamental miscarriage of justice occurs if a constitutional violation has probably resulted in the conviction of someone who is "actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327 (1995). To meet the "fundamental miscarriage of justice" exception, a petitioner must show constitutional error coupled with "new reliable evidence—whether...exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324.

Petitioner's failure to fairly present his federal claim in the state courts deprived the state courts of a "full and fair opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *Boerckel*, 526 U.S. at 845. Petitioner cannot return to state court to raise the unexhausted claim in an untimely and successive postconviction motion. *See* Fla.R.Crim.P. 3.850(b), (h). Consequently, the exhaustion requirement remains unsatisfied, rendering Ground Three procedurally defaulted. Recognizing the default, Petitioner asserts entitlement to federal review under *Martinez v. Ryan*, 566 U.S. 1 (2012) (Doc. 1 at 15, 17).

*Martinez* holds that, "[w]here, under state law, claims of ineffective assistance of trial counsel must be raised in an initial review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial review collateral proceeding, there was

no counsel or counsel in that proceeding was ineffective." 566 U.S. at 17.[6] A claim that lacks merit or is without factual support is not "substantial." *Id.* at 15–16.

"Florida law requires the authentication of a document prior to its admission into evidence." *Third Fed. Sav. & Loan Ass'n of Cleveland v. Koulouvaris*, 247 So. 3d 652, 654 (Fla. 2d DCA 2018) (citations omitted). *See also* § 90.901, Fla. Stat. (2012) ("Authentication or identification of evidence is required as a condition precedent to its admissibility."). "Proffered evidence is authenticated when its proponent introduces sufficient evidence 'to support a finding that the matter in question is what its proponent claims.'" *Koulouvaris*, 247 So. 3d at 654 (quoting § 90.901).

Co-defendant Andre Brown testified he, Petitioner, and the 3 other co-defendants were at the Poinciana (the city in which the offenses occurred) Walmart and gas station (Murphy's Oil) on the night of October 3, 2009 (Doc. 8-5, Ex. 11, Part 3 at docket pp. 205-07). Co-defendant Bryson likewise testified he, Petitioner, and the 3 other co-defendants were at the Walmart that night (*Id.* at docket pp. 638-49). He also identified Petitioner in a still shot from the surveillance video at Murphy's Oil (*Id.* at 649-53).

Detective Lung testified Detective Campbell obtained the video tapes from the Walmart and Murphy's Oil in Poinciana and put together a CD containing the relevant portions of the tapes (Doc. 8-4, Ex. 11, Part 2 docket pp. 757-59). Detective Campbell testified he obtained the video from the Poinciana Walmart and the

---

[6] Petitioner was not provided counsel during his initial post-conviction proceeding alleging ineffective assistance of trial counsel (Doc. 8-9, Exs. 50-53).

Murphy's Oil (Doc. 8-6, Ex. 11, Part 4 at docket pp. 106-10). Mark Rainey, the director of loss prevention and investigations for Murphy's Oil responsible for all the stores' security cameras and recordings, identified a Murphy's Oil surveillance video from 11:12 p.m. on October 3, 2009, and still shots from the video (Doc. 8-5, Ex. 11, Part 3 at docket pp. 362-76). When defense counsel questioned Mr. Rainey regarding authentication of the video, Mr. Rainey said he knew it was a Murphy's Oil surveillance video but could not say from which store it came (*Id.* at docket p. 367). After questioning Mr. Rainey about the video, defense counsel stated, "I have no objection to its entry based upon the inquiry I had." (*Id.*).

Petitioner cannot show counsel was deficient in failing to object to admission of the video or still shots based on a lack of authentication or relevance. The detectives testified the video was obtained from the Murphy's Oil in Poinciana, and the still photos were from that video. Mr. Rainey watched the video and saw the still shots and verified they were from a Murphy's Oil surveillance camera and the dates on which the video was captured. Thus, counsel reasonably could conclude the video and still shots were sufficiently authenticated as coming from the Murphy's Oil in Poinciana on the night of the offense. *See Mullens v. State*, 197 So. 3d 16, 25 (Fla. 2016) ("[A]uthentication for the purpose of admission is a relatively low threshold that only requires a prima facie showing that the proffered evidence is authentic; the ultimate determination of the authenticity of the evidence is a question for the fact-finder.") (citation omitted). And because they were sufficiently authenticated, the

video and still shots were relevant in identifying Petitioner and his location at and around the time of the offenses.

Petitioner also cannot show prejudice. Had counsel objected to the authentication issue, the State most likely would have brought in the witness needed to further authenticate the video and still shots, and the evidence would have been admitted. Moreover, even if the video and still shots were not admitted, considering Petitioner's own statements and his co-defendants' testimony placing him at the scene, he cannot show a reasonable probability of a different outcome.

Petitioner does not overcome the procedural default under *Martinez* because he fails to show his defaulted ineffective assistance of trial counsel claim is substantial. And Petitioner cannot meet the "fundamental miscarriage of justice" exception to overcome the default because he presents no "new reliable evidence" that he is actually innocent. *Schlup*, 513 U.S. at 327. Because Petitioner satisfies neither exception to procedural default, Ground Three is procedurally barred from federal review.

GROUND FOUR: COUNSEL FAILED TO INVESTIGATE AND PRESENT EVIDENCE OF THE RECORDING BEING ALTERED AND THE INTERROGATION NOT BEING RECORDED FOR THE SOLE PURPOSE OF CONCEALING THE MIRANDA VIOLATION AND THE COERCIVE TACTICS UTILIZED BY THE PCSO

Petitioner alleges that when he was interrogated by the officers, they did not honor the invocation of his right to remain silent, and they used threats, promises, and other coercive tactics to obtain a false confession from him. He further alleges these events were recorded but either destroyed or unpreserved. He contends that

although counsel raised these issues in the motion to suppress his statements, counsel was ineffective in failing to investigate and present certain evidence to support the motion. Specifically, he argues counsel should have investigated other officers at the sheriff's office at the time of his interrogation, and any officer who knew how to operate the recording equipment. He opines counsel could have obtained names by investigating the "log in for the computer attached to monitoring and recording system" and the "log in procedure for the building." This, he claims, would have revealed who was in the building at the time of the interrogation who may have been a witness, and who logged in and operated the recording equipment at the time of the interrogation. He states counsel would have "found testimony that the interrogation was in fact recorded." Petitioner also argues because he told counsel "pieces of the tape [were] missing in between the clearly recorded times[,]" counsel should have retained a video expert "to show the recording had been altered[.]" He contends had counsel obtained this evidence, the motion to suppress his statements would have been granted, and there is a reasonable probability he would have been found not guilty.

Respondent argues Ground Four is procedurally barred from federal review (Doc. 8 at 21). Petitioner concedes he failed to exhaust this claim of ineffective assistance of trial counsel in the state courts (Doc. 1 at 22). However, Petitioner again asserts entitlement to federal review under *Martinez* (*Id.*).

Petitioner provides no evidence to support his assertions. He presents no sworn statement or testimony from a witness addressing the alleged coercion by

officers, issues about the video recording, or an expert stating the video recording was manipulated. Thus, Petitioner shows no prejudice because it is speculative whether counsel would have found a witness who would have provided testimony supporting Petitioner's allegations of coercion or that the video was altered. This claim is too speculative to warrant habeas relief. *See Johnson v. Alabama*, 256 F.3d 1156, 1187 (11th Cir. 2001) ("Johnson offers only speculation that the missing witnesses would have been helpful. This kind of speculation is 'insufficient to carry the burden of a habeas corpus petitioner.'" (quoting *Aldrich v. Wainwright*, 777 F.2d 630, 636 (11th Cir. 1985))); *United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991) ("[E]vidence about the testimony of a putative witness must generally be presented in the form of actual testimony or affidavit. A defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim.").

Petitioner would have been a witness to any coercion, and he may have known that portions of the recorded interrogation were missing (although he alleges no facts explaining how he knew). But counsel called Petitioner to testify regarding those matters, both during the hearing on the motion to suppress (Doc. 8-2, Ex. 5 at docket pp. 275-309) and at trial (Doc. 8-6, Ex. 11, Part 4 at docket pp. 715-37). And during closing, counsel argued Petitioner's statements were not voluntary or reliable because the evidence showed they were coerced by the officers' threats, false promises, lies about evidence, and pressure on Petitioner's wife, and there were

probably eight or nine hours of videotape the jury did not see (Doc. 8-7, Ex. 11, Part 5 at docket pp. 144-50). Thus, Petitioner fails to show counsel performed deficiently.

Because Petitioner fails to demonstrate either deficient performance or prejudice under *Strickland*, Ground Four is not "substantial" so as to excuse his failure to exhaust it in state court. And Petitioner presents no new, reliable evidence showing the actual innocence exception applies to excuse his default of this claim. Accordingly, Claim Four is procedurally barred from federal review.

GROUND FIVE: COUNSEL RENDERED INEFFECTIVE ASSISTANCE IN FAILING TO REQUEST THE ALIBI JURY INSTRUCTION IN SUPPORT OF MCCLOUD'S SOLE DEFENSE

Petitioner presented an alibi defense. He therefore contends counsel was ineffective in failing to request Florida's Standard Jury Instruction 3.6(i), the instruction on the alibi defense. He argues had counsel requested the instruction, the request would have been granted, and the instruction "would have given the jury a viable alternative to the principal instruction." (Doc. 1 at 24).

Respondent argues Ground Five is procedurally barred from federal review (Doc. 8 at 22-24). Petitioner concedes he failed to exhaust this claim of ineffective assistance of trial counsel in the state courts (Doc. 1 at 25). However, Petitioner once again asserts entitlement to federal review under *Martinez* (Doc. 1 at 23-25).

The defense presented by Petitioner was an alibi defense. In support, counsel called: 1) Petitioner's wife, Shawana McCloud; 2) Petitioner's brother-in-law, Marlon Britten; 3) Petitioner's mother-in-law, Dora Norman; 4) Petitioner's father-

in-law Harold Scott; and 5) Mark Ayers, who at the time of the offenses was renting a room at Harold Scott's house and had worked with Petitioner. They essentially testified that on the night and early morning hours of the offenses, Petitioner was at the hospital with Shawna McCloud then back at her house in Apopka, Florida, watching one or more children (Doc. 8-6, Ex. 11, Part 4 at docket pp. 60-98; 495-597). During closing argument, defense counsel argued to the jury that the testimony of these witnesses established Petitioner was in Apopka when the offenses occurred in Poinciana (Doc 8-7, Ex. 11, Part 5 at docket pp. 128-32).

Respondent does not dispute that defense counsel requested no alibi jury instruction. The Florida Pattern Jury Instruction on Alibi states:

> An issue in this case is whether the defendant was present when the crime was committed. If you have a reasonable doubt that defendant was present at the scene of the alleged crime, it is your duty to find the defendant not guilty. 3.6(i) Alibi.

In *United States v. Russell*, 717 F.2d 518 (11th Cir. 1983), the Eleventh Circuit stated:

> A defendant is entitled to an instruction relating to his or her theory of defense if there was evidence presented at trial to support the theory. However, an appellate court in reviewing a jury charge need only ascertain whether the charge, when viewed as a whole, fairly and correctly states the issues and law. *United States v. Bosby*, 675 F.2d 1174, 1184 n. 17 (11th Cir.1982); *United States v. Pool*, 660 F.2d 547, 558 (5th Cir. Unit B. 1981). Reversible error does not occur as long as the charge on the whole accurately reflects the legal issues. *United States v. Nickerson*, 669 F.2d 1016, 1021 (5th Cir. Unit B. 1982).

*Id.*, at 521.

Although Petitioner's jury was not specifically instructed on the theory of alibi, the trial court's charge as a whole correctly stated the issues and law and was adequate. The jury was instructed Petitioner was presumed innocent, the State had the burden to overcome the presumption and prove Petitioner committed the crime beyond a reasonable doubt, and Petitioner had no burden to present evidence or prove anything (Doc. 8-7, Ex. 11, Part 5 at docket pp. 193-94). Additionally, the court instructed the jury regarding the reliability of the evidence, weighing the evidence, and the credibility of witnesses (*Id.* at docket pp. 194-96). The jury was instructed it could believe or disbelieve all or any part of the evidence presented or the testimony of any witness (*Id.* at docket p. 195). Thus, the jury essentially was instructed that they should find Petitioner not guilty if they believed his testimony or the testimony of his alibi witnesses.

The prosecution presented evidence from which the jury could conclude that Petitioner was present during the offenses. Both Andre Brown and Bryson testified Petitioner helped plan the robbery and participated in the robbery and murders (Doc. 8-5, Ex. 11, Part 3 at docket pp. 165-68, 215-46, 624-80). Bryson identified Petitioner from the still shots taken of the video from the Poinciana Murphy's Oil they were at shortly before the offenses (*Id.* at docket pp. 649-53). Petitioner admitted he was involved in the conspiracy (Doc. 8-6, Ex. 11, Part 4 at docket pp. 668-70). And he gave a statement to law enforcement in which he admitted he was with his co-defendants at the scene of the offenses and gave detailed descriptions of events, some

of which were consistent with his co-defendants' testimony  (Doc. 8-5, Ex. 11, Part 3 at docket pp. 920-46).

Considering the compelling testimony and evidence, the extensive and accurate jury instructions given, and defense counsel's argument during closing that the evidence showed Petitioner was not at the scene of the offenses, Petitioner has not established a reasonable probability that the outcome of the trial would have been different had the jury received an alibi instruction. *See, e.g., Walker v. Sec'y, Fl. Dep't of Corr.*, 2019 WL 1676207, at *14 (M.D. Fla. Apr. 17, 2019) (concluding that petitioner "cannot demonstrate prejudice [on claim counsel was ineffective in failing to request an alibi jury instruction] because even if the alibi instruction were read, there is no reasonable probability the outcome of the trial would have been different."). Thus, he fails to demonstrate prejudice.

Petitioner does not overcome the procedural default under *Martinez* because he fails to show his defaulted ineffective assistance of trial counsel claim is substantial. And Petitioner cannot meet the "fundamental miscarriage of justice" exception to overcome the default because he presents no "new reliable evidence" that he is actually innocent. *Schlup*, 513 U.S. at 327. Because Petitioner satisfies neither exception to procedural default, Ground Five is procedurally barred from federal review.[7]

_____

[7] Petitioner requests an evidentiary hearing on Grounds Three, Four, and Five (Doc. 9 at 1). A hearing is not warranted because Petitioner has not shown ineffective assistance of trial counsel for the reasons stated above. *See Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) (stating that "if the record refutes the applicant's factual allegations or otherwise precludes

Any of Petitioner's allegations not specifically addressed herein have been found to be without merit.

Accordingly:

1. The Petition for Writ of Habeas Corpus (Doc. 1) is **DENIED**. The **Clerk of Court** is directed to enter judgment against Petitioner and close this case.

2. This Court should grant an application for a Certificate of Appealability (COA) only if Petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). He cannot make this showing. Accordingly, a COA is **DENIED**. And because Petitioner is not entitled to a COA, he may not proceed on appeal *in forma pauperis*.

**ORDERED** in Tampa, Florida on March 20, 2023.

Charlene Edwards Honeywell
United States District Judge

Copies to: Petitioner, *pro se*
            Counsel of Record

---

habeas relief, a district court is not required to hold an evidentiary hearing"). Moreover, the Court's ability to receive new evidence to resolve a defaulted ineffective assistance of trial counsel claim is limited by the holding in *Shinn v. Ramirez*, ___ U.S. ___, 142 S.Ct. 1718, 1734 (2022) (in the context of a claim defaulted under *Martinez* due to postconviction counsel's ineffective assistance, "under § 2254(e)(2), a federal habeas court may not conduct an evidentiary hearing or otherwise consider evidence beyond the state-court record based on ineffective assistance of state postconviction counsel.").